NUMBER 13-07-047-CR


 

COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


RODNEY CLINE, Appellant,


v.



THE STATE OF TEXAS, Appellee.

 


On appeal from the 411th District Court 

of San Jacinto County, Texas

 


MEMORANDUM OPINION


Before Justices Yañez, Benavides, and Vela


Memorandum Opinion by Justice Vela



 Appellant, Rodney Cline, appeals his conviction for the manufacture of more than
400 grams of a controlled substance, methamphetamine. (1) By two issues, Cline argues the
evidence was legally and factually insufficient to support the conviction. We affirm.

I. Background


 When Constable Charles Clack tried to serve a felony probation warrant on
Catherine Starling at a home near Coldspring, Texas on April 6, 2005, he and fellow
officers discovered two methamphetamine labs. (2) Starling told officers she operated the
labs along with her boyfriend, John Cline, who was present, and his brother, Rodney Cline,
who was not present. Chris Martin, Starling's sixteen-year-old son, told officers he lived
there and that the bedroom where one of the labs was located was where Rodney Cline
slept. John Cline, who was high on methamphetamine, claimed both labs belonged to
Rodney Cline. James Cline, John and Rodney's father, and former owner of the house, (3)
said he knew nothing of the meth labs.

 The raid resulted in at least five indictments for manufacturing a controlled
substance. John Cline and Catherine Starling pleaded guilty to manufacturing a controlled
substance. John received a five-year prison sentence; Starling received five years'
community supervision in return for testifying against Rodney Cline. Rodney pleaded not
guilty. James Cline and his wife Lydia were also indicted. (4) 

 At Rodney Cline's trial, the only eye-witness connecting Rodney with manufacturing
meth was Catherine Starling. She testified Rodney stayed in the bedroom that contained
a meth lab and that she had seen him drying chemicals and cutting matches, but had not
personally watched him mix all of the chemicals into a final product. She explained that,
while Rodney was not at the home on April 6, 2005 (the date of the raid), he had been
there either one or two days earlier. She testified John and Rodney Cline aided each other
in producing meth and jointly sold it from the home. 

 Starling's son, Chris Martin, testified he had seen Rodney using the microwave in
a way that he associated with producing meth. He also said the bedroom where the meth
lab was found was Rodney's.

 The prosecution also presented testimony from Constable Clack, from another
officer present during the April 6th raid, from a state meth task force officer, and from a
crime-lab chemist, though they gave no evidence directly linking Rodney to the crime.

 The defense presented testimony from four witnesses, testifying that Rodney Cline
did not live at the Coldspring house in the weeks preceding the raid. (5) One of them, John,
specifically said that Rodney was not involved in meth production at the Coldspring house.

 The jury found Rodney guilty. At a sentencing hearing on November 30, 2006, the
trial court sentenced him to fifteen years in prison, the minimum sentence available for the
crime. (6) He now appeals to this Court.

II. Accomplice-Witness Testimony


 Rodney's two issues claim the evidence was legally and factually insufficient to
support the jury's verdict. A fundamental element of both issues is that there was
insufficient evidence to corroborate Catherine Starling's testimony, and thus we should
exclude it from consideration under the accomplice-witness rule.

 Neither a judge nor a jury can convict a defendant based on the testimony of an
accomplice unless there is independent evidence "tending to connect" the defendant with
the crime. Tex. Code Crim. Proc. Ann. art. 38.14 (Vernon 2005); Druery v. State, 225
S.W.3d 491, 498 (Tex. Crim. App. 2007). To determine whether accomplice testimony is
sufficiently corroborated under the accomplice-witness rule, we must eliminate the
accomplice testimony from consideration and then examine the remaining portions of the
record to see if there is any evidence that tends to connect the accused with the
commission of the offense. Solomon v. State, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001). 

 The non-accomplice evidence need not directly link the defendant to the crime, nor
must it be sufficient to establish guilt beyond a reasonable doubt; rather, the standard is
only that it have a tendency to connect the defendant to the crime. Dowthitt v. State, 931
S.W.2d 244, 249 (Tex. Crim. App. 1996). While the defendant's mere presence at the
crime scene is not sufficient by itself to corroborate accomplice testimony, evidence of
such presence, coupled with other suspicious circumstances, may tend to connect the
accused to the offense. Trevino v. State, 991 S.W.2d 849, 851-52 (Tex. Crim. App. 1999)
(quoting Dowthitt, 931 S.W.2d at 249).

 Here, the non-accomplice evidence comes from Starling's son, Chris Martin: (7)

 Q: Okay. Are you familiar with how methamphetamine is manufactured?

 

 A: Not the whole thing, but I know you have got to dry it out.

 

 Q: Okay. And did you see Rodney Cline doing anything related to making
methamphetamine? 

 

 A: I seen him go to the microwave and use it a lot. 

 

 Q: Okay. And do you see what he was taking to the microwave? 

 

 A: It was a plate-looking thing. It's like what they made cornbread in, but it's
glass.

 

 Q: Okay. Was cornbread or some other food in that?

 

 A: No, sir. 

 

 Q: Okay. What did it look like that was in there?

 

 A: It looked like the bottom was real foggy.


 Among the evidence found in the bedroom where Rodney slept was a round glass
pie plate coated in a residue of liquid and powder. It tested positive for methamphetamine. 
Constable Clack testified meth producers often use microwaves to dry their product. Also
shown to the jury was a photograph taken of a microwave found in the bedroom. The
photograph showed a spoon and syringe inside the microwave, which Constable Clack told
the jury were tools often used in producing meth. This evidence tends to connect Rodney
to the manufacture of methamphetamine; thus Starling's testimony could be used to
convict Rodney of the crime.

III. Legal and Factual Sufficiency


 In reviewing the legal sufficiency of the evidence to support a conviction, we view
all the evidence in the light most favorable to the verdict in order to determine whether any
rational trier of fact could have found the essential elements of the crime beyond a
reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); Hampton v. State, 165
S.W.3d 691, 693 (Tex. Crim. App. 2005). This standard gives full play to the responsibility
of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw
reasonable inferences from basic facts to ultimate facts. Jackson, 443 U.S. at 319. The
trier of fact is the sole judge of the weight and credibility of the evidence. Tex. Code Crim.
Proc. Ann. art. 38.04 (Vernon 1979); Margraves v. State, 34 S.W.3d 912, 919 (Tex. Crim.
App. 2000). Thus, when performing a legal-sufficiency review, we may not re-evaluate the
weight and credibility of the evidence and substitute our judgment for that of the fact-finder. 
Dewberry v. State, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). We must resolve any
inconsistencies in the evidence in favor of the judgment. Curry v. State, 30 S.W.3d 394,
406 (Tex. Crim. App. 2000). 

 When reviewing the factual sufficiency of the evidence, we view all the evidence in
a neutral light, favoring neither party. Watson v. State, 204 S.W.3d 404, 414 (Tex. Crim.
App. 2006); Drichas v. State, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005). We will set
aside the verdict only if: (1) the evidence supporting the conviction, although legally
sufficient, is nevertheless so weak that the fact-finder's determination is clearly wrong and
manifestly unjust; or (2) the verdict is against the great weight and preponderance of the
evidence. Watson, 204 S.W.3d at 414-15, 417; Johnson v. State, 23 S.W.3d 1, 11 (Tex.
Crim. App. 2000). We cannot conclude a conviction is "clearly wrong" or "manifestly
unjust" simply because we would have voted to acquit. Watson, 204 S.W.3d at 417. In
other words, we may not simply substitute our judgment for the fact-finder's judgment. 
Johnson, 23 S.W.3d at 12; Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). 
To reverse for factual sufficiency, we must determine, with some objective basis in the
record, that the great weight and preponderance of the evidence contradicts the verdict. 
Watson, 204 S.W.3d at 417. In examining a factual sufficiency challenge, we defer to the
fact-finder's determination of the credibility of the evidence. Swearingen v. State, 101
S.W.3d 89, 97 (Tex. Crim. App. 2003).

Elements of the Offense


 The essential elements of the crime Rodney Cline was charged with are that he (1)
knowingly (2) manufactured (3) more than 400 grams (4) of a controlled substance listed
in Penalty Group 1. See Tex. Health & Safety Code Ann. § 481.112(a), (f). 
Methamphetamine is a controlled substance listed in Penalty Group 1. See Tex. Health
& Safety Code Ann. § 481.102(6) (Vernon 2003).

Analysis


 Catherine Starling testified Rodney made meth in the bedroom of the Coldspring
house and that he traded ingredients with John, who made meth in the shed behind the
house. Chris Martin testified he had seen Rodney using the microwave in a way that he
associated with producing meth. He also said the bedroom where the meth lab was found
was Rodney's. Though Chris was not completely familiar with how methamphetamine was
manufactured, he knew that "you have got to dry it out." He saw Rodney using the
microwave "a lot" and said that Rodney would take to the microwave a "plate-looking thing"
"like what they made cornbread in, but it's glass." He testified there was no cornbread or
other food in that glass container.

 Among the evidence found in the bedroom where Rodney slept was a round glass
pie plate coated in a residue of liquid and powder. It tested positive for methamphetamine. 
Constable Clack testified meth producers often use microwaves to dry their product. Also
shown to the jury was a photograph taken of a microwave found in the bedroom. The
photograph showed a spoon and syringe inside the microwave, which Constable Clack told
the jury were tools often used in producing meth.

 The crime lab determined that the amount of meth recovered from the joint
operation was greater than 400 grams. Accordingly, the evidence is legally sufficient to
support the verdict. We overrule Rodney's first issue.

 In addition to the extensive evidence that meth labs existed at the Coldspring house,
the evidence against Rodney consisted of one prosecution witness who said that Rodney
lived at the Coldspring house around the time of the raid and made meth there, and one
witness who said Rodney lived at the Coldspring house around the time of the raid and
performed activities associated with making meth. The defense presented one witness
who said Rodney did not make meth and did not live in the Coldspring house at the time,
and three witnesses who said Rodney did not live at the Coldspring house at the time.
From the evidence in the record, it is impossible to conclude that the verdict was manifestly
unjust or that it was against the great weight and preponderance of the evidence. Thus,
we defer to the fact-finder's decision. We overrule Rodney's second issue.

IV. Conclusion


 We affirm the judgment of the trial court.

 

 

 ROSE VELA 

 Justice



Do not publish.

Tex. R. App. P. 47.2(b).


Memorandum Opinion delivered and

filed this 29th day of July, 2008.
1. See Tex. Health & Safety Code Ann. §§ 481.102(6), 481.112(f) (Vernon 2003 & Supp. 2007). 
2. One was in a room inside the house; the second was in a shed in the back yard.
3. The house seems to have been owned by James Cline, Jr., who is otherwise uninvolved with this
case. At trial, James Cline, Sr. testified that he and his wife were living in Humble at the time. Starling testified
that they were living in the Coldspring house. Various witnesses disagreed on how many people lived at the
Coldspring house. Starling said that there were seven, Martin said six, John and James Cline, Sr., and his
wife, Lydia Cline, said four. 
4. As of Rodney's trial, they had yet to be tried.
5. Defense witnesses did not agree on when, precisely, Rodney stopped living at the Coldspring house,
though all agreed he did not live there after April 1. 
6. See Tex. Health & Safety Code Ann. § 481.112(f) (Vernon 2003).
7. Though Martin seems to have been present when methamphetamine was being produced at the
Coldspring house, there are no allegations that he participated in the criminal enterprise.